**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lynn Jay FREDELL and, James
Phelps, Defendants–
Appellants.**

Nos. 02–5531, 02–5584.

United States Court of Appeals,
Sixth Circuit.

Oct. 28, 2003.

Candace G. Hill, Asst. U.S. Attorney, Terry M. Cushing, Asst. U.S. Attorney, U.S. Attorney's Office, Louisville, KY, for Plaintiff–Appellee.

Scott C. Cox, Michael R. Mazzoli, Cox & Mazzoli, Louisville, KY, for Defendant–Appellant.

Lynn Jay Fredell, pro se.

Before GIBBONS and SUTTON, Circuit Judges; and TARNOW, District Judge.*

GIBBONS, Circuit Judge.

Defendant-appellant Lynn Jay Fredell was convicted by a jury of multiple crimes, including engaging in a continuing criminal enterprise, conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, possession with intent to distribute marijuana and methamphetamine, and possession of a firearm in furtherance of a drug trafficking crime. After the jury entered its verdict, Fredell pled guilty to two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). Fredell was sentenced to 420 months in prison.

Defendant-appellant James Phelps was convicted of one count of conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute approximately seventy-five kilograms of marijuana, in

---

* The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Phelps was sentenced to 188 months in prison.

Fredell asserts numerous claims on appeal. Fredell appeals his conviction for engaging in a continuing criminal enterprise on the basis that there was insufficient evidence for the district court to find that he organized, supervised, or managed five or more persons in his drug operation. In the alternative, Fredell appeals his conviction for conspiracy to distribute marijuana on the ground that he cannot be convicted of both conspiracy and engaging in a continuing criminal enterprise. Fredell also contends that the district court allowed the use of impermissible hearsay testimony at his trial. Fredell appeals his sentence on the ground that the district court erred in applying an enhancement for obstruction of justice.

In addition to these claims asserted through counsel, Fredell, proceeding *pro se*, contends that he did not voluntarily and knowingly plead guilty to two counts of being a felon in possession of a firearm. Fredell also argues *pro se* that the district court erred in permitting testimony during his trial that he was an ex-felon. Fredell claims *pro se* that his entire conviction should be vacated because he received ineffective assistance of counsel at trial. Fredell also asserts *pro se* that the district court erred in denying his motion to suppress evidence.

Like Fredell, Phelps appeals his conviction on the ground that he was deprived of effective assistance of counsel. Phelps appeals his sentence on the ground that the district court erroneously applied enhancements for methamphetamine activity and for firearm possession. Phelps further contends that there was not sufficient evidence to support his conviction.

For the reasons set forth below, we vacate Fredell's conviction and sentence for conspiracy. We affirm all other judgments against Fredell and Phelps.

## I.

On December 6, 2000, the grand jury for the Western District of Kentucky returned a second superseding indictment charging Fredell with one count of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848 (Count 1); one count of conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846 (Count 2); two counts of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts 3 and 5); one count of possession with intent to distribute approximately 800 grams of a substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 4); one count of possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 6); and two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g) and 924(a)(2) (Counts 7 and 8). The grand jury also charged Phelps under Counts 2 and 5 of the same indictment.[1]

---

1. The indictment also charged Roelio Aguiar, Alvino Rodriguez, and Terry Joe Burden with conspiracy to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846 (Count 2) and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 5).

   Aguiar and Rodriguez pled guilty to all counts charged by the grand jury. Burden pled guilty to conspiracy to distribute marijuana (Count 2). Burden also pled guilty to an information charging him with perjury, in violation of 18 U.S.C. § 1621, for falsely swearing in an affidavit that he—and by implication, not Fredell—possessed firearms found in Burden's truck when officers executed a search warrant at Fredell's residence. Fredell submitted Burden's false affidavit in his motion for reconsideration of the detention order before trial.

Fredell owned and operated the Mid–Town Pawn Shop in Beaver Dam, Kentucky, and he hired Phelps as manager of the pawn shop. The Mid–Town Pawn Shop was a focal point of Fredell's marijuana and methamphetamine distribution operation. Joseph Hamad, who stored drugs for Fredell, testified that Fredell was the "top man" and that Phelps was a "gopher" who "picked up and delivered" drugs.

At trial, the government presented numerous witnesses who testified that Fredell and Phelps bought and sold marijuana and methamphetamine. John Clothier gave extensive testimony as to the inner workings of Fredell's operation. Starting in 1997, Fredell "fronted" marijuana to Clothier at a price of up to $1,600 per pound. According to this arrangement, Clothier would not pay Fredell for the marijuana until Clothier actually sold it. Beginning in 1999, Clothier testified that Fredell received shipments at his home of 100 to 200 pounds of marijuana, and three to five pounds of methamphetamine, per week. From December 1999 to May 2000, Clothier distributed thirty or forty pounds of marijuana at a time through Fredell's pawn shop. Clothier completed these transactions by fronting one-pound blocks of marijuana to his customers. Clothier testified that the price of each sale of marijuana "depended on Mr. Fredell and who [the customer] was." In his testimony, Clothier named Phelps, Kenneth Copley, Jimmy "Hoghead" Rogers, Kenny Stacey, Roger Pharris, Alvino Rodriguez, and Terry Burden as persons who distributed drugs received from Fredell.

Terry Burden testified that he began to sell marijuana and methamphetamine for Fredell and Phelps around November 1999. Specifically, Burden received two to four ounces of methamphetamine a week, and a pound of marijuana at a time, from Fredell or Phelps. Burden paid for the drugs after he sold them. Burden also testified that, at the direction of Fredell, he broke into Phelps's house and stole ten pounds of marijuana because Phelps owed Fredell money. Burden then gave three pounds of the stolen marijuana to Fredell and sold the remaining quantity himself.

Besides Burden, Donald Hall also sold marijuana that he received from Phelps. Hall testified that he received marijuana by going to the pawn shop, telling Fredell what he wanted, and paying Fredell. Phelps would then distribute the marijuana to Hall at Fredell's request. On some occasions, Hall testified that Fredell would "front" the drugs to him.

In 1999 Fredell contacted Alvino Rodriguez, asking Rodriguez for information on drug distributors. Fredell then bought a pound of methamphetamine from Rodriguez, who had received the drugs from Mario Salazar. During the course of the next year, Fredell purchased methamphetamine that Rodriguez had received from Roman Mareno, in quantities of one to two pounds each time. Rodriguez made methamphetamine deliveries for Fredell at Phelps's house. Rodriguez also sold 109 pounds of marijuana to Fredell for $650 per pound, which Roelio Aguiar delivered to Fredell's garage around early May 2000, with Fredell, Phelps, Aguiar and Rodriguez present.

Fredell stored drugs intended for later sale at various locations. He stored marijuana in the wall of his garage, which was adjacent to his home, or at the pawn shop. He also stored methamphetamine in his garage or at Phelps's house. In addition, Fredell paid Joseph Hamad and Forrest Chinn to store drugs for him. Hamad testified that he received five to ten pounds of marijuana "every couple of weeks" from Clothier or Fredell to store at Hamad's house.

On May 13, 2000, Roman Mareno, Roelio Aguiar, Alvino Rodriguez, and an individual with Mareno went to Fredell's pawn shop to collect money Fredell owed them for marijuana. Fredell in turn told Clothier to contact Kenneth Copley, Lonnie Maggard, Jimmy Rogers, and two other persons to collect the money that they owed Fredell. Clothier succeeded in collecting over $50,000 from these individuals and gave the money to Rodriguez.

Shortly after May 13, 2000, Clothier, who testified that he feared something might happen if Fredell did not pay his drug suppliers, explained "his situation" to his brother, a detective with the Owensboro Police Department. Detective Clothier suggested to his brother that he contact FBI Agent Gary Coffey. John Clothier met with Agent Coffey on May 14, 2000. On May 22 at his home, Clothier showed Agent Coffey two pounds of methamphetamine that Clothier told Coffey he had taken from Fredell's garage. Clothier then returned to Fredell's garage with the two pounds of methamphetamine and left with twelve pounds of marijuana. Clothier told Coffey he was instructed to deliver one pound to Roger Pharris and to take the rest of the marijuana to Joseph Hamad's house for storage. Agent Coffey instead confiscated the marijuana intended for Hamad.

Coffey obtained a search warrant for Fredell's residence and garage and for Fredell's pawn shop. On May 25, 2000, Coffey conducted visual surveillance of Clothier and fitted him with a transmitter that allowed FBI agents to monitor his conversations. Clothier entered Fredell's garage wearing the FBI transmitter. Aguiar's car also entered the garage. Fredell asked Clothier to go to Lonnie Maggard's house to collect $8,000, which Maggard owed Fredell for an earlier methamphetamine purchase. Fredell told Clothier that Aguiar had asked for $8,000 before he would complete the impending marijuana sale with Fredell. Clothier then went to Maggard's residence, where he obtained $8,000. Clothier returned to Fredell's garage and gave the $8,000 to Fredell. Fredell then handed the money over to Aguiar.

While Clothier was collecting the $8,000 from Maggard, Phelps arrived at Fredell's garage. When Clothier returned to the garage, Phelps was weighing the marijuana that Aguiar had delivered. Phelps recorded the weight of the marijuana shipment as 169.515 pounds and noted that seven pounds were to be subtracted from that amount. Fredell had taken seven pounds of marijuana from Aguiar in exchange for a Corvette.

Agent Coffey and others then executed the search warrant. As the officers approached the garage, Rodriguez threw a bag (found to contain $3,900) into a truck parked in Fredell's driveway. Fredell threw a 9mm Ruger semiautomatic handgun, which he obtained from his waistband, into the truck as well. The officers recovered these items from the truck. When officers searched the garage, they found a two-pound package of methamphetamine; thirteen grams of cut methamphetamine; two digital scales; marijuana residue; a cardboard box and a piece of paper, each with 169.515 minus seven written on them; a Corvette with a seven-pound block of marijuana in the trunk; a limousine with approximately 155 pounds of marijuana in the trunk; and Aguiar's car, which contained $9,000 in money orders and $5,000 in cash.

The officers searched Fredell's house, in which they found and seized a loaded .44 magnum Ruger revolver. Officers also searched a Mercedes–Benz SUV parked at Fredell's pawn shop, in which they found and seized a planner notebook listing Fredell as its owner. In the notebook was

written "56,500 plus 15,000 Mule" and "110 times 650 equals 71,500 minus 15,000 equals 56,500." The latter equation appeared on an envelope inside of the notebook, along with a series of numbers totaling 109.58. Agent Coffey testified that these amounts were consistent with a marijuana shipment Fredell received in May 2000.

Fredell, Rodriguez, Aguiar, and Burden were arrested on May 25, 2000. Phelps was arrested on October 10, 2000. On August 23, 2001, the jury found Fredell guilty of Counts 1 through 6 in the second superseding indictment. The jury also found Phelps guilty of all counts charged against him in the second superseding indictment (Counts 2 and 5). Fredell pled guilty to two counts of being a felon in possession of a firearm (Counts 7 and 8). Fredell was sentenced to a total of 420 months in prison: 360 months in prison on Counts 1, 2, 3, 4, 5, 7, and 8, and 60 months on Count 6, to be served consecutively to the 360–month sentence. Phelps was sentenced to 188 months in prison on Counts 2 and 5.

## II.

### A.

Fredell argues that insufficient evidence was presented at trial to establish that he was an "organizer, supervisor, or manager" of five or more persons in the distribution of drugs as part of a continuing criminal enterprise (CCE). Fredell concedes, however, that he managed Phelps, Clothier, Hamad, and Chinn in his drug operation.

When reviewing an appeal of a conviction for engaging in a continuing criminal enterprise based on a claim of insufficiency of evidence, we consider whether the "evidence taken in the light most favorable to the government was sufficient to lead a rational trier of fact to find beyond a reasonable doubt that [the defendant] acted in concert with at least five individuals for whom he acted as an organizer, supervisor, or manager." *United States v. Long*, 190 F.3d 471, 475 (6th Cir.1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "In determining the sufficiency of the evidence, we must 'refrain from independently judging the credibility of witnesses or the weight of the evidence.'" *Id.* (quoting *United States v. Welch*, 97 F.3d 142, 148 (6th Cir.1996)).

A conviction for engaging in a CCE requires the government to prove "(1) a felony violation of a federal narcotics law; (2) as a part of a 'continuing series of violations' of federal drug laws; (3) 'in concert with five or more persons'; (4) for whom defendant is an organizer, supervisor, or manager; and (5) from which he derives substantial income or resources." *Id.* at 474–75 (citing 21 U.S.C. § 848(c)). Evidence of "a buyer-seller relationship with the defendant is not sufficient to support a conviction for engaging in a CCE." *Id.* at 475.

Fronting drugs, "without additional elements of control," is a mere buyer-seller relationship. *United States v. Ward*, 37 F.3d 243, 248 (6th Cir.1994). However, proof that an individual "knew about the drug operation, took orders directly from the [organizer, supervisor or manager] and helped in the drug business" can place that individual under the defendant's organization or supervision. *Id.* at 247 (citing *United States v. English*, 925 F.2d 154, 157 (6th Cir.1991)). In deciding whether a defendant had a managerial relationship with five or more persons, the jury is not required to agree unanimously on the identities of the five individuals. *English*, 925 F.2d at 157. *See United States v. Beverly*, 913 F.2d 337, 352–53 (7th Cir.1990); *United States v. Linn*, 889 F.2d 1369, 1374 (5th Cir.1989).

■ Fredell's claim of insufficiency of the evidence is unpersuasive.[2] In addition to Phelps. Clothier, Hamad, and Chinn, both Rodriguez and Burden knew about Fredell's drug operation, took orders from Fredell and helped in the drug business. Fredell directed Rodriguez to arrange for drug deliveries made to Fredell. Burden testified that he sold drugs "for" Fredell and Phelps. Burden also broke into Phelps's house to steal marijuana, when Fredell instructed him to do so, because Phelps owed Fredell money. Therefore, reviewing the evidence in the light most favorable to the government, the evidence presented at trial was sufficient to lead a rational trier of fact to find beyond a reasonable doubt that Fredell acted as an organizer, supervisor, or manager of five persons.

■ Because we do not reverse Fredell's conviction for CCE, we must consider his claim that his conviction for conspiracy under 21 U.S.C. § 846 cannot stand in conjunction with his CCE conviction. In *United States v. Avery,* this court held that conspiracy under 21 U.S.C. § 846 is a lesser included offense of CCE, 21 U.S.C. § 848, 128 F.3d 966, 970 (6th Cir.1997) (citing *Rutledge v. United States,* 517 U.S. 292, 300, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996)). In *Rutledge,* the Supreme Court noted that " § 846 is a lesser included offense of § 848 because § 848 requires proof of every fact necessary to show a violation under § 846 as well as proof of several additional elements." *Rutledge,* 517 U.S. at 300, 116 S.Ct. 1241. "As such, conviction under both statutes constitutes

cumulative or multiple punishment not authorized by Congress." *Avery,* 128 F.3d at 971.

Although the record does not reflect that Fredell raised this issue with the district court, the government concedes that "it was error to allow Fredell's conspiracy conviction on Count 2 to stand, along with the CCE conviction under Count 1." Because the conspiracy charge is a lesser included offense of the CCE charge, we vacate Fredell's conviction under Count 2 of the second superseding indictment for conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846.

### B.

Fredell also challenges the admissibility of Agent Coffey's testimony concerning the role played by various individuals in Fredell's drug operation. In his testimony, Agent Coffey, using a chart, told the jury the names of persons who were involved with Fredell's drug sales, where those persons were from, and what function they served in assisting Fredell with his drug transactions. In giving this testimony, Agent Coffey relied on information provided to him by John Clothier. Fredell's counsel objected to this testimony at trial as hearsay, and on appeal, Fredell argues that the admission of this evidence constituted reversible error.

This court reviews the district court's admission of evidence over a hearsay objection for abuse of discretion. *United States v. Khalil,* 279 F.3d 358, 363 (6th

---

**2.** Fredell characterizes a managerial relationship, for CCE purposes, as "only" arising when the manager dictates the price, territory, or customers to others, or when others transport or store drugs for the manager. (Appellant–Fredell's Brief at 20) (citing *United States v. Patrick,* 965 F.2d 1390, 1396 (6th Cir.1992); *United States v. Chalkias,* 971 F.2d 1206, 1214 (6th Cir.1992)). Fredell's reliance on this court's prior holdings is inaccurate. In *Patrick* and *Chalkias,* we noted that the activities Fredell describes would constitute a managerial relationship, but we have not held that those activities are the only basis for a jury to find that a defendant was the organizer, supervisor, or manager of five or more persons in a CCE.

Cir.2002). Hearsay is an out of court statement offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(c). The government argues that Agent Coffey's testimony was admissible because his statements explained how and why the investigation into Fredell's drug operation began.

It is true that this court has determined that "[i]n some circumstances, out of court statements offered for the *limited purpose* of explaining why a government investigation was undertaken have been determined not to be hearsay." *United States v. Martin,* 897 F.2d 1368, 1371 (6th Cir.1990) (emphasis added). We have described the purpose of this rule as follows:

> The context of [the agent's] testimony supports the determination that the assertion of the other person was offered for the limited purpose of explaining how and why the investigation began. The prosecution was not trying to use the other person's information due to a lack of evidence on the substantive charges. The prosecution had other, more probative, evidence ... at its disposal. Therefore, the testimony based upon an out of court statement ... was *not* hearsay *per se.*

*Id.*

■ The statements made by Agent Coffey describing the composition of Fredell's drug organization went beyond explaining the initial steps of his investigation. Coffey, conveying information given to him by Clothier, not only identified the players in Fredell's operation, but also stated what specific actions they took to support Fredell's engagement in the buying and selling of drugs. This testimony was hearsay. These statements were not presented for the "limited purpose" of explaining why Coffey launched his investigation into Fredell's activities or what the initial steps of his investigation were. Therefore, it was error for the district court to admit these statements made by Agent Coffey.

■ Nevertheless, the district's court's admission of this hearsay evidence constitutes harmless error. The improper admission of hearsay evidence is harmless error "unless it is more probable than not that the error materially affected the verdict." *United States v. Hernandez,* 227 F.3d 686, 696 (6th Cir.2000) (quoting *United States v. Toney,* 161 F.3d 404, 410 (6th Cir.1998)). It is not probable that Agent Coffey's testimony materially affected the jury's decision to convict Fredell because the government presented numerous witnesses at trial, including actual participants in Fredell's operation, who testified as to the roles played by themselves and others in supporting Fredell's drug transactions. As a result, the admission of Agent Coffey's testimony does not constitute reversible error.

## C.

Fredell also appeals an enhancement applied by the district court to his sentence for obstruction of justice. The district court increased Fredell's sentence by two levels for obstruction of justice because Fredell submitted an affidavit, prepared by Terry Burden and acknowledged by Burden to be false, in support of his motion for reconsideration of the order requiring that Fredell be detained before trial. Burden's affidavit stated that he owned the two pistols found in his truck at the time that officers executed the search warrant at Fredell's residence. Burden pled guilty to an information charging him with perjury, in violation of 18 U.S.C. § 1621, for falsely swearing to this affidavit. The district court applied the enhancement to Fredell by reasoning that only Fredell—and not Burden—could benefit from Burden's false statements.

We review a district court's application of an obstruction of justice enhancement under the U.S. Sentencing Guidelines (U.S.S.G.) Manual in three steps:

First, this Court applies a clearly erroneous standard to the district court's findings of fact with respect to the enhancement. Second, a district court's determination of whether facts constitute obstruction of justice is a mixed question of law and fact that requires *de novo* review. Third, once there has been a finding that the defendant obstructed justice, application of the enhancement is mandatory, so review of the enhancement at that point is *de novo*.

*United States v. Roberts*, 243 F.3d 235, 237 (6th Cir.2001) (internal citations omitted).

The guidelines provide that "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels." U.S.S.G. § 3C1.1. The commentary to the guidelines lists "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding" as an example of obstruction of justice. U.S.S.G. § 3C1.1 cmt. n. 4(c).

■ At the time he pled guilty to crimes charged in the second superseding indictment, Burden stated that he signed the false affidavit that Fredell later submitted in his motion for reconsideration. Fredell does not assert that he believed Burden's affidavit to be true. Rather, he urges us to find the enhancement was in error because there is no evidence that "Fredell actively encouraged Burden to make the false statement." Even in the absence of such "active encouragement," the district court did not commit clear error in finding that Fredell had obstructed justice. The evidence at trial revealed that Burden often acted at Fredell's urging, such as by breaking into Phelps's house in order to collect on a debt owed to Fredell. Burden had nothing to gain—and Fredell had everything to gain—by Fredell's submission of an affidavit in which Burden declared that he owned and possessed the guns in question. Therefore, the district court's finding that Fredell obstructed justice, which resulted in an enhancement of his sentence under the Sentencing Guidelines, was not clearly erroneous.

D.

In a supplemental brief filed *pro se*, Fredell asserts additional claims. First, he contends that he received ineffective assistance of counsel at trial. Second, he claims that he did not knowingly and voluntarily plead guilty to two counts of being a felon in possession of a firearm under 18 U.S.C. §§ 922(g) and 924(a)(2). Third, he asserts that the district court erred in denying his motion for mistrial after a government witness testified that Fredell was an ex-felon. Fourth, Fredell asserts that the district court erred in denying his motion to suppress evidence seized from the search of Fredell's house, garage, and pawn shop.

With respect to Fredell's first *pro se* claim, Fredell asserts that he was deprived of effective assistance of counsel throughout his trial because his attorney at sentencing was different from his attorney during trial and because his trial attorney provided him with incorrect advice on his plea options. Fredell has not filed an affidavit attesting to these claims or provided other evidentiary support for his allegations. Therefore, the record does not provide an adequate basis for resolution of Fredell's claim.

We leave the ineffective assistance of counsel claim for collateral proceedings. This court does not permit a defendant to raise ineffective assistance of counsel claims for the first time on direct appeal, "since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations," unless the record is adequate to address the defendant's claim. *United States v. Tucker,* 90 F.3d 1135, 1143 (6th Cir.1996). Fredell should pursue this claim in a post-conviction proceeding under 28 U.S.C. § 2255.

Concerning the second issue presented in his *pro se* brief, Fredell claims that since he received a certificate restoring his civil rights by the Governor of Kentucky, he should not have pled guilty to being a felon in possession of a firearm.[3] Title 18 U.S.C. § 921(a)(20) provides that "[a]ny conviction which ... has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." In applying this standard, we look beyond the certificate of restoration of civil rights to the entire state law and have established a two-step inquiry for determining whether such a certificate eliminates consideration of a prior conviction under 18 U.S.C. §§ 922(g) and 924(a)(2). *Payne v. United States,* No. 93–6129, 1995 WL 6060, at *2 (6th Cir. Jan.6, 1995) (citing *United States v. Cassidy,* 899 F.2d 543, 546 (6th Cir.1990)). The test provides:

> First, the court look[s] to see if the restoration of civil rights included the rights to vote, hold public office and sit on a jury. If the defendant had each of these rights restored, then his civil rights have been restored under section 921(a)(20). After determining that defendant's civil rights have been restored, we must then ascertain whether state law expressly restricts defendant from possessing a firearm.

*Id.* (internal citations and quotations omitted).

Under Kentucky law, a certificate from the Governor of Kentucky restoring an individual's civil rights restores the right to suffrage, the right to hold public office, and the right to serve on a jury. *Id.* Therefore, Fredell meets the first stage of the inquiry. However, Fredell fails to satisfy the second part of the test because Kentucky statutory law makes it a crime for any felon, who was convicted after January 1, 1975, to carry a firearm, *regardless of whether his civil rights have been restored. Id.* (citing Ky.Rev.Stat. Ann. § 527.040). Because Fredell was convicted of multiple felonies in Kentucky from 1981 to 1986, the restoration of his civil rights does not preclude Fredell from being charged with and convicted of being a felon in possession of a firearm under 18 U.S.C. §§ 922(g) and 924(a)(2). Therefore, we reject Fredell's claim that he did not knowingly and voluntarily plead guilty to counts charged under 18 U.S.C. §§ 922(g) and 924(a)(2) because his civil rights had been restored.

Third, Fredell challenges the district court's denial of his motion for mistrial after Alvino Rodriguez testified that Fredell was an ex-felon.[4] During Rodriguez's testimony, the following exchange occurred:

---

**3.** Fredell has attached an unauthenticated copy of a certificate of restoration of civil rights by Kentucky to his *pro se* brief. This document is not included in the record.

**4.** We note that Fredell's characterization of this testimony is not entirely accurate, since the witness testified that Fredell had been in prison, but did not refer to his status as a felon.

Q. Could you tell us what Mr. Fredell told you about receiving marijuana from Texas?

A. First of all, he say he—when he just come out of prison he was broke and he don't got nothing, so he started going to Texas -

THE COURT. Hold on. Disregard that answer, ladies and gentlemen.

Fredell contends that the district court erred in not granting his motion for mistrial because of Rodriguez's statement.

■ Evidence concerning prior crimes committed is generally inadmissible to prove that a defendant is guilty of the crime charged. Fed.R.Evid. 404(b). "However, the general rule is that the subsequent striking of erroneously admitted evidence accompanied by a clear and positive instruction to the jury to disregard cures the error." *United States v. Steele*, 727 F.2d 580, 588 (6th Cir.1984) (citing *United States v. Wells*, 431 F.2d 432, 433 (6th Cir.1970)). From the record, there is sufficient evidence that the district court gave a clear and positive instruction immediately after Rodriguez's statement was made to disregard the statement. Therefore, we find no error in the district court's denial of Fredell's motion for a mistrial.

Finally, Fredell asserts that the district court erred in denying his motion to suppress evidence seized from the search of his house, garage and pawn shop. Fredell claims that the search warrant relied on by the officers was deficient on its face and that the affidavits supporting the warrant did not establish probable cause to conduct the search. In support of these claims, Fredell provides only speculation.

■ This court reviews a district court's decision on a motion to suppress under two standards. "Findings of fact are upheld unless clearly erroneous, while conclusions of law are reviewed *de novo.*" *United States v. Leake*, 95 F.3d 409, 416 (6th Cir.1996). Fredell has failed to present a supported assertion of error in the district court's denial of the motion, and we decline to find error in the district court's decision.

### III.

### A.

Like Fredell, Phelps asserts that he was deprived of effective assistance of counsel at trial. Specifically, he claims that he received ineffective assistance because his first counsel withdrew two months before trial and his second counsel had inadequate time to prepare. In addition, Phelps claims that his counsel did not make a motion to suppress handwriting exemplars that were obtained from him.

■ Besides referencing the district court's denial of a motion for a continuance, Phelps has not presented an affidavit in support of his claims or provided additional evidentiary support on behalf of his claims. As with Fredell, since the record is not sufficient to review Phelps's claim that he was deprived of effective assistance of counsel throughout the trial process, we find that Phelps should pursue this claim in a post-conviction proceeding under 28 U.S.C. § 2255. *See United States v. Tucker*, 90 F.3d 1135, 1143 (6th Cir.1996).

### B.

Phelps appeals two enhancements applied by the district court to his sentence: (1) an enhancement for methamphetamine activity, and (2) an enhancement for firearm possession.

In determining Phelps's base offense level, the district court enhanced Phelps's sentence for criminal activity involving methamphetamine, as provided for in U.S.S.G. § 1B1.3(a)(1)(B).[5] The district

---

5. U.S.S.G. § 1B1.3(a)(1)(B) provides that a

calculation of base offense level shall include

court enhanced Phelps's offense level because his actions, in furtherance of Fredell's purchases and sales of methamphetamine, constituted participation in jointly undertaken criminal activity. Phelps argues that since he was not charged with any crime involving methamphetamine, and since the government presented evidence that only alleged Phelps's involvement with methamphetamine sales, his sentence should not be enhanced on this basis.

This court reviews the factual findings of a district court made with respect to giving a sentence under the guidelines for clear error, and the legal conclusions of a district court *de novo*. *United States v. Russell*, 76 F.3d 808, 812 (6th Cir.1996). In order for a district court to enhance a sentence, proof in support of the enhancement must meet the preponderance of the evidence standard. *United States v. Robison*, 904 F.2d 365, 371 (6th Cir.1990). In other words, for a district court to enhance a defendant's sentence, "due process requires that facts used for sentencing must have 'some minimum indicium of reliability beyond mere allegation.'" *Id.* (quoting *United States v. Smith*, 887 F.2d 104, 108 (6th Cir.1989)).

██ In this case, the district court enhanced Phelps's sentence for involvement in Fredell's methamphetamine transactions by expressly adopting findings made in Phelps's Presentence Investigation Report that Phelps received shipments of methamphetamine at his residence. The district court also found that Phelps weighed drugs for Fredell's operation, was present at their delivery, was involved in

the storage of marijuana and methamphetamine for Fredell, and distributed methamphetamine to Burden and others. In light of these findings, the district court's conclusion that Phelps acted with reasonable foreseeability in furtherance of the methamphetamine activities of Fredell and others was not in clear error.

Phelps also challenges the enhancement to his sentence for firearm possession. This court reviews a district court's factual finding that a defendant possessed a firearm during a drug trafficking offense for clear error. *United States v. Hough*, 276 F.3d 884, 894 (6th Cir.2002). To enhance a defendant's sentence for firearm possession, "the government must establish that 1) the defendant actually or constructively possessed the weapon, and 2) such possession was during the commission of the offense." *Id.* Furthermore,

> [c]onstructive possession is established if the defendant had ownership, or dominion or control over the [firearm] itself, or dominion over the premises where the [firearm] is located. Once the government establishes possession during an offense, it creates a presumption that the weapon was connected to the offense. The defendant must then show that it was clearly improbable that the weapon was connected with the crime.

*Id.* (internal citations and quotations omitted).

The district court enhanced Phelps's sentence for possession of a firearm on May 25, 2000. the date of Fredell's arrest, as provided for by U.S.S.G. § 2D1.1(b)(1).

in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all *reasonably foreseeable* acts and omissions of others in furtherance of the jointly undertaken crimi-

nal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added).

In applying this enhancement, the district court stated that

> [t]he evidence in the case is clearly that Mr. Fredell possessed a firearm in connection with this drug trafficking offense. It was present. It's not shown that it's clearly improbable that the weapon was being used in connection with an offense, and I think that with respect to whether Mr. Phelps could foresee that that was going to happen, the evidence was that Fredell carried a gun all the time. There was videotape to that effect. He certainly was aware that Mr. Fredell was engaged in trafficking, and so I think the adjustment was proper.

Phelps admits that pawn shop owners, such as Fredell, carry firearms. While Phelps concedes it was "not surprising" that the district court found that Fredell carried a weapon at all times, Phelps argues that he did not necessarily know that Fredell carried a weapon in furtherance of a drug conspiracy as opposed to as a pawn shop owner.[6]

■ When reviewing a sentencing enhancement for firearm possession, this court has not required a conspirator to have actual knowledge of the purpose behind another conspirator's possession of a firearm. Rather, we have held that possession of a firearm by one member of a conspiracy "is attributable to another co-conspirator if such possession constitutes reasonably foreseeable conduct." *United States v. Chalkias*, 971 F.2d 1206, 1217 (6th Cir.1992). In *Chalkias*, we upheld the district court's decision to enhance a defendant's sentence because "[the defendant] should have reasonably foreseen that [the co-conspirator] would possess the gun during, and in connection with the drug conspiracy of which she was a part." *Id.* Likewise Phelps should have reasonably foreseen that Fredell would carry a weapon in connection with their extensive drug operation. Therefore, it was not clear error for the district court to enhance Phelps's sentence under U.S.S.G. § 2D1.1(b)(1).

## C.

■ Finally, without referencing the record, Phelps argues that the government failed to produce adequate evidence to sustain his conviction. We will not overturn a conviction based on insufficiency of evidence presented at trial "if after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Phelps's unsupported claim alone does not demonstrate that the government failed to produce sufficient evidence for a rational trier of fact to find him guilty of the crimes charged beyond a reasonable doubt.

## IV.

For the reasons set forth above, we vacate Fredell's conspiracy conviction and affirm all other judgments against Fredell and Phelps.

---

**6.** Phelps does not provide evidence in the record that supports the assertion that he did not know Fredell possessed a weapon in furtherance of selling drugs.